IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ORIENTAL TRADING COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> DENOVO VENTURES, LLC, <br><br> Defendant. | Civil Action Case No. <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COMES Plaintiff Oriental Trading Company, Inc. ("Plaintiff" or "OTC"), and for its Complaint against Denovo Ventures, LLC ("Defendant" or "Denovo"), alleges as follows:

### INTRODUCTION

1. This action arises out of Defendant Denovo's complete failure to provide Plaintiff OTC with effective software customization and implementation services, despite years of effort and millions of dollars in expenditures by OTC.

2. Specifically, OTC retained Denovo to assist it in customization and implementation of Oracle Cloud Enterprise Resource Planning ("ERP") software that OTC licensed from Oracle. Denovo represented to OTC—at each and every turn in the contracting process—that Denovo had the experience, skills, and personnel necessary to customize the Oracle Cloud ERP system to meet OTC's needs. Denovo's representations in this regard were false, however, as Denovo did not have extensive experience with, or in-depth knowledge of, the Oracle Cloud ERP platform, nor did it have personnel capable of fulfilling OTC's business needs.

3. As a result, Denovo's services to OTC were inadequate, untimely, and exorbitantly costly. After nearly three years and over four million dollars, OTC still does not have Oracle Cloud ERP functionality.

4. Upon information and belief, this is not the first time Denovo has misrepresented its abilities in order to obtain lucrative contracts it could not perform. A previous Denovo client, Vector Resources, Inc., brought a lawsuit against Denovo alleging that—much as it did here—Denovo failed to provide a workable ERP solution for Vector Resources, despite promising that Denovo had the knowledge, experience and personnel necessary to effectively implement the solution, causing Vector to incur substantial sums and lose months of effort.

5. Due to Denovo's fraudulent misrepresentations of its abilities, and its repeated, material breaches of the parties' agreements, OTC brings this action to recover the significant damages OTC has incurred as a result of Denovo's fraud and breaches of the parties' contracts.

## PARTIES

6. Plaintiff OTC is a Delaware corporation with its principal place of business in Omaha, Nebraska.

7. Upon information and belief, Defendant is a Colorado limited liability company with its principal place of business in Boulder, Colorado.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because this dispute is between citizens of different states and the amount in dispute between the parties is in excess of $75,000.00, exclusive of costs and interest.

9. Specifically, Plaintiff is a Delaware corporation with its principal place of business in Omaha, Nebraska. On information and belief, Defendant is a Colorado limited liability company whose members are individuals who are citizens of states other than Delaware

and Nebraska. Plaintiff has been damaged in excess of $4.2 million, exclusive of interest and costs.

10. Jurisdiction over Defendant is proper because Defendant transacts business in Nebraska, contracted to supply services in Nebraska, and caused tortious injury by acts or omissions in Nebraska.

11. Venue is appropriate in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

12. With more than 60,000 unique products, Plaintiff Oriental Trading Company is the nation's leading direct retailer of value-priced party supplies, toys and crafts as well as a leading provider of fundraising products.

13. Defendant Denovo provides services in the information technology sphere. Denovo purports to be a "full-service Enterprise Hosting/Cloud Computing, Application Managed Services, Managed Disaster Recovery and Professional Services firm with extensive expertise in designing, implementing and supporting enterprise software."

### A. OTC Engages Denovo

14. Prior to 2019, OTC utilized an ERP platform licensed by Oracle called JD Edwards ("JDE") World. ERP software is a company-wide software system used by businesses such as OTC to manage the company's core business processes in real time. Generally speaking, ERP systems are designed to satisfy the software requirements of all departments and functions within a business by integrating the software applicable to each of those departments into a single program that can serve, within one system, the needs of the various departments and interface information from one department or function to other departments or functions within

the business. The purpose of ERP is to provide companies with a fully-integrated and continuously-updated view of the company's business across a variety of business functions, including sales, procurement, production, distribution, accounting and customer relationship management, among other processes.

15. In 2016-2017, OTC began contemplating a change to its 25-year old ERP technology. OTC endeavored to determine whether it would be beneficial to upgrade the existing platform to a newer version of the JDE product, JDE EnterpriseOne, or switch over to a newer platform, Oracle Cloud ERP. OTC reached out to Oracle for guidance, and Oracle introduced OTC to Denovo.

16. In OTC's initial discussions with Denovo, Denovo represented that it had extensive experience with both the JDE and Cloud ERP systems, and could evaluate which option would be best suited for OTC.

17. Initial meetings between OTC and Denovo were conducted at OTC's headquarters on January 17, 2019, with Denovo personnel Sara Piscatello, Susan Szymanski, and Michael Lennon in attendance. In a subsequent presentation provided on February 7, 2019, Denovo estimated a Cloud ERP implementation cost of approximately $760,000, with a 5-year investment of $1.7-$1.9 million (compared to a $1.75-$2.1 million investment to stay with OTC's current solution, saving $100-$200K by going to the cloud). At that time, Denovo estimated that cloud implementation would take 6 months. In its presentation, Denovo noted its capability to provide "flexible support of your journey to a modern ERP solution" and claimed 800+ implementations demonstrating a "proven track record of satisfying Oracle clients." Denovo identified one of its "core focus[es]" as Cloud ERP.

18. Based on Denovo's representations concerning its experience and abilities with the relevant platforms, in March of 2019, OTC and Denovo entered into a Master Services Agreement ("MSA") (attached as Exhibit A), along with a Statement of Work ("SOW") titled Consulting Services Statement of Work 002 ("SOW 002") (attached as Exhibit B). Pursuant to the MSA and SOW 002, OTC retained Denovo to evaluate the propriety of both the JDE and Cloud ERP platforms for OTC's business. Denovo's estimate of fees under SOW 002 was $42,800.

19. Denovo subsequently traveled to OTC's headquarters in Nebraska and conducted several "brown paper" sessions over several months, ostensibly to learn OTC's business needs and evaluate the potential technological solutions. During these meetings, OTC provided detailed and in-depth information on its system and requirements.

20. On April 30, 2019, Denovo team members Bud Shaw, Susan Szymanski, Larry Berger, and Scott Sears demonstrated JDE upgrade options to OTC. On May 2, 2019, Denovo team members Michael Lennon, Tom Connolly, and Bob Bullman demonstrated Oracle Cloud ERP.

21. In a presentation delivered to OTC in mid-June 2019, Denovo outlined options to proceed under each of the JDE and Oracle Cloud ERP solutions. In its presentation, Denovo claimed that it was a "mid-market leader in delivering Enterprise Application and Cloud Services," working "in close partnership with [its] clients to help drive business value through effective use of both legacy and cloud technologies." Denovo further touted its "Oracle Specialized Partner Certifications," including in cloud solutions, and again referenced its "[p]roven track record of satisfying Oracle clients." Denovo also showed a "logo slide" with numerous cloud customers, implying its success in the Cloud ERP space. Based on discussions

around Denovo's presentation during an on-site meeting on June 18, 2019, the Denovo team presented the Oracle Cloud ERP option as the best long-term value and best investment for the future for OTC.

22. OTC reasonably relied on Denovo's representations that it was experienced and knowledgeable in Oracle Cloud ERP when it decided to select Cloud ERP for its replacement platform and engage Denovo to provide design and implementation services. OTC agreed to retain Denovo on a "time and materials" basis—rather than a fixed-price basis—because it believed, based on Denovo's representations, that Denovo had undertaken a substantial effort to understand OTC's business processes and would develop solutions reasonably promptly.

### B. The Design Phase

23. In October 2019, OTC and Denovo entered into SOW 003 (attached as Exhibit C), pursuant to which Denovo agreed to develop functional and technical designs for Oracle Cloud ERP based on OTC's business needs, at an estimated cost of $176,942 to OTC. An email from Denovo account management on October 4, 2019 to OTC provided an "all Denovo" list of team members who would be staffed on the design phase (and, if continued, the implementation phase) of the project.

24. Denovo proceeded to develop the designs after numerous discussions with OTC and its business partners. At no time did Denovo indicate that it anticipated any difficulties implementing the designs it developed, and in fact Denovo represented that it could implement its solutions quickly and effectively. In reliance on Denovo's representations and failure to disclose any perceived difficulties, OTC agreed to proceed to implementation of the designs.

### C. The Implementation Phase

25. In February 2020, OTC and Denovo executed SOW 004 (attached as Exhibit D), pursuant to which Denovo, with OTC's assistance, would implement the functional and technical design solutions Denovo proposed. At the time, Denovo forecasted a 53-week time period to go-live (in February 2021), and projected a cost of $1,395,404.

26. Despite Denovo's assurances regarding its capabilities for implementing the system designs, the Denovo project to implement Oracle Cloud ERP was a disaster. Denovo's implementation team was continually plagued with performance issues, scheduling problems, resource turnover, gaps that were not adequately addressed, and incompetent project management, planning, scheduling, gap identification and issue resolution processes.

27. Specifically, after the "brown paper" sessions in early-to-mid-2019, and the design phase spanning from October 2019 through February 2020, as part of the implementation phase of the project that commenced in February 2020, Denovo delivered its functional and technical designs to OTC for development and unit testing. As part of the development and unit testing phase of the project, OTC was to code the interface programs to move data between OTC's legacy systems and the Cloud ERP system based on Denovo's design instructions.

28. Although OTC adhered to Denovo's instructions, the specifications did not work as designed, suffering numerous functional and technical misses. A number of these failures were attributable to Denovo's decision to ignore OTC's business needs. Numerous business requirements discussed in the brown paper sessions were overlooked entirely. Instead, Denovo focused on a "happy path" that was geared toward completing testing quickly, despite the fact that the simplified solutions offered by Denovo were unworkable for OTC's business. Just a few examples of Denovo's decision to ignore OTC's requirements include:

7

- Accounts Receivable Payment Methods – Denovo failed to accommodate OTC's accounts receivable payment methods. Denovo did not take into account OTC's various payment methods (*e.g.*, credit card, discounts, Paypal, merchandise certificates, gift cards, open account), and it took months of pressure for Denovo to accept the importance of the various payment methods and ensure they were properly accounted for in the design.

- Supplier Conversion – For nearly eight weeks, OTC painstakingly attempted to help Denovo re-design the supplier conversion. OTC led the analysis only after it became apparent that Denovo was not capable of meeting its obligation to do so. As designed, OTC would have been unable to convert suppliers into the new ERP, which would result in the company being unable to pay suppliers and unable to issue purchase orders for those suppliers.

- Statistical Forecasting/Supply Forecasting/Demand Forecasting – OTC disclosed the need to help OTC business leaders to understand the impact of sellable inventory. Denovo was dismissive of OTC's requests and failed to meet its needs.

29. OTC explained to Denovo—multiple times—what the failures of the solutions were and what requirements needed to be addressed. Each time, Denovo purported to make changes to the specifications, but they repeatedly failed, again because Denovo chose to ignore the requirements OTC identified and/or failed to understand how to implement those requirements in Cloud ERP. This cycle continued repeatedly with each interface. Denovo ignored OTC's instructions, failed to provide workable solutions, and engaged in increasingly recalcitrant and combative behavior, blaming OTC for the failings of the solutions.

30. Over the course of the project, it also became apparent that Denovo did not understand the Cloud ERP product, despite its numerous representations to the contrary. Denovo repeatedly failed to find solutions to basic problems. Just a few examples of Denovo's lack of expertise in Cloud ERP include:

- Product Testing – For OTC's product testing needs, Denovo represented during the design phase that the ERP system would be a "100% match" to OTC's legacy system; however, during implementation, Denovo was never able to address the product testing process and could not provide a workable solution.

- Accounts Receivable – Denovo was unable, for nearly a year, to provide a solution for the requirement to invoice an order with its sales tax already calculated outside of Cloud ERP. Ultimately, Oracle's intervention was required to solve this issue. This was a major cost overrun to the project and caused months of delay.

- Approved Suppliers List – After several months and significant overruns in cost, Denovo advised that there was no conversion available for approved suppliers.

- Credit Card Processing – Denovo did not know that Cloud ERP could not interface with OTC's Payment Gateway and Credit Card Processor, resulting in unplanned work and third party software costs for OTC.

- Self-service for emails – Denovo had to learn from Oracle that the Cloud ERP product does not allow customer self-service updates to customer email addresses.

- On numerous occasions, Denovo personnel indicated that their solutions—which were not working in Cloud ERP—should work because they "worked in EBS," a prior version of the ERP solution. Denovo may well have understood EBS, but it clearly did not have sufficient familiarity with Cloud ERP to properly implement the software for clients.

- Because of its lack of knowledge of Cloud ERP, Denovo had to submit over 150 service requests to Oracle to obtain assistance with the system. Despite its prior representations to the contrary, Denovo simply did not understand or have sufficient experience with the Cloud ERP system.

31. In addition to Denovo's institutional knowledge failures, Denovo failed to provide competent, professional, and knowledgeable personnel for the project throughout implementation. Denovo's staff were combative, uncooperative, and lacked the collaborative skills necessary to fulfill the project timeline and scope of work required. In fact, many of the staff were independent contractors or contractors belonging to a 3rd party subcontractor—TipTop Consulting—rather than dedicated, accountable, and experienced Denovo employees.

32. The project staff Denovo provided were inexperienced, lacked leadership, and suffered from frequent turnover and general incompetence, resulting in months of wasted and unproductive time, lack of collaboration between themselves and OTC's personnel devoted to the project, and numerous delays and added costs to the project. Typifying the lack of adequate

personnel on the project, Denovo's financial architect position was a revolving door throughout the implementation phase, with three different managers over the course of the years-long project. Specific examples of Denovo team turnover include:

- Supply Chain Functional Lead Anurag Goel was removed from the project because he misrepresented the system's functionality for landed cost.

- Goel was replaced with Tomer Sapir. Sapir was a junior architect who was inexperienced, inefficient, and ineffective.

- Financials Architect Don Bernatchez was unable to perform his job duties and was increasingly combative and hostile, to the point that OTC demanded he be removed from having direct contact with OTC. Dave Devore, Bernatchez's replacement, worked on the project for a short amount of time and left for unknown reasons. Devore's replacement, Oscar Santa Cruz, was also combative and difficult to work with; toward the end of the engagement, senior Denovo leadership was recommending to OTC that they remove him from the project.

- Soumya Kancheti, one of Denovo's technical experts, left for maternity leave with little advance notice from Denovo to OTC and her transition and time away created numerous issues for the project, when that could have been avoided with proper advance planning and staffing by Denovo.

- The original project manager, Mike Wahl, left shortly after the implementation phase started. The project manager for the bulk of the project, Stephen Goldsmith, left the project at the end of August 2021 with little advance notice being provided to OTC. While there had been discussions between the parties regarding increasing mutual frustration with Stephen's ineffectiveness, the actual transition was made with very little notice and no competent backfill available, which was never resolved.

33. Denovo's fundamental lack of understanding of Cloud ERP generally and OTC's business needs specifically, as well as its continued failure to provide workable solutions and experienced, competent personnel, led to numerous schedule delays and exorbitant increases in costs.

34. By April 2021, after numerous delays and missing the original implementation date, it had become very clear that the project could not continue on the current path. Denovo leadership came to OTC's headquarters in Nebraska in May 2021 to discuss a going-forward

strategy. The parties agreed to a focused approach wherein Denovo would endeavor to provide a certain number of fully-completed work products by July 2021. By October 2021, however, after three months of missing monthly milestones and rescheduling work further, very few of the objectives had actually been met, and OTC was forced to request that Denovo suspend all work on the project.

### D. Denovo's False Promises

35. As became clear during the implementation phase of the project, despite Denovo's promises and representations to OTC, Denovo had no intention of performing, or the ability to perform, as it had represented in its proposals, presentations, and contract documents.

36. Instead, upon information and belief, Denovo was aware that it did not have adequately knowledgeable or experienced staff to successfully complete the customization for OTC. Indeed, from the start of the implementation project, Denovo subcontracted to another party, TipTop Consulting, for the majority of the required expertise due to Denovo's internal lack of skills/resources in this area. Moreover, after halting the project in the fall of 2021, Denovo's CEO David Shimoni stated to OTC that Denovo was working to "build its practice" in this area and would no longer leave it to a third party to help Denovo, despite Denovo's representations that it already had extensive experience with, and knowledge of, Cloud ERP during prior years in the sales and design cycles leading up to the implementation.

37. Upon information and belief, Denovo's misrepresentations were made intentionally, willfully and maliciously to keep OTC from learning the true facts about Denovo's inexperience with and lack of knowledge of the Cloud ERP solution, to allow Denovo to charge significant fees and expenses to OTC. Indeed, Denovo ultimately invoiced OTC for over $2.7M, over $1M more than the cost estimates it provided to OTC. Near the time work was halted on

the project, Denovo further estimated that hundreds of thousands of dollars in additional fees (if not more) would be required to bring the project to completion.

### E. Denovo Has Done This Before

38. On further information and belief, Denovo has a pattern and practice of perpetrating such misrepresentations as a means to further hook customers such as OTC by requiring substantial investment in the subject project before the true, much larger costs are determined and disclosed.

39. In particular, a previous client of Denovo's, Vector Resources, Inc., brought a lawsuit against Denovo styled *Vector Resources, Inc. v. Denovo Ventures, LLC*, et al., No. 30-2016-00830774-CU-FR-CJC (Cal. Super. Ct.) (attached as Exhibit E), alleging that Denovo failed to provide a workable ERP solution for Vector Resources, despite promising that Denovo had the experience and personnel necessary to effectively implement the solution.

40. According to Vector, it retained Denovo to provide ERP system implementation services to Vector, which Denovo represented it had the software, team and expertise to provide. However, as alleged in Vector's complaint, Denovo's representations were false, as the software Denovo recommended was not a close fit for Vector's needs, and Denovo knew that it "did not have sufficient adequately knowledgeable or experienced staff to successfully complete the customization" for Vector. Instead, like Denovo's efforts here, the Vector project was plagued with performance issues, numerous delays, increased costs, and combative and uncooperative staff, many of whom were independent contractors who had never worked before as a team. Like OTC, Vector relied on Denovo's false assertions of knowledge and expertise, and paid Denovo handsomely for benefits it never received.

## COUNT ONE
### FRAUD/FRAUDULENT INDUCEMENT

41.     OTC repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

42.     Denovo fraudulently induced OTC to enter into the agreements described above by intentionally misrepresenting its skills and experience with Cloud ERP.

43.     Denovo's misrepresentations were made with intent to induce OTC to enter into contracts with Denovo and incur substantial costs to purchase software configuration and implementation services from Denovo without conferring any benefit on OTC.

44.     OTC had no way of knowing Denovo's misrepresentations were untrue.

45.     OTC reasonably relied upon the misrepresentations of Denovo in entering into contracts with Denovo and moving forward with the Cloud ERP project.

46.     As a direct and proximate result of Defendant's misrepresentations, OTC incurred substantial costs, including but not limited to the purchase of years of consulting services from Denovo.  As a further direct and proximate result of Denovo's misrepresentations, upon which OTC reasonably relied, OTC incurred significant internal costs, lost productivity of its employees involved in the project for years, was forced to retain another consultant to perform the work OTC contracted with Denovo to perform, paid significant licensing fees to a third party, and incurred other damages in amounts subject to proof at the time of trial.

## COUNT TWO
### BREACH OF CONTRACT

47.     OTC repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

48.     As set forth above, OTC entered into written agreements with Denovo.

49. OTC gave good and valuable consideration for the written agreements.

50. Under the parties' agreements, Denovo agreed to provide customization services for the Cloud ERP system, including designing functional and technical solutions and effectively implementing those solutions. Denovo agreed to provide these services in a good and workmanlike manner by individuals with levels of knowledge, skill, and experience commensurate with the requirements of the agreements. Denovo also agreed to make reasonable efforts to keep the project within budget for the scoped design.

51. As set forth above, Denovo materially breached its written agreements with OTC by, *inter alia*, failing to deliver a customized ERP system tailored to meet OTC's needs, failing to staff the project with appropriate personnel, and failing to make reasonable efforts to keep the project within budget and on an appropriate timeline.

52. OTC performed all of the conditions, covenants, and requirements of it under the parties' written agreements.

53. As a direct and proximate result of Denovo's breaches, OTC has suffered damages in an amount to be proven at the time of trial.

## COUNT THREE
### UNJUST ENRICHMENT

54. OTC repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

55. As set forth above, Denovo made numerous false representations to OTC regarding its skills and experience with Cloud ERP in order to induce OTC to enter into contracts with Denovo and incur substantial costs to purchase software configuration and implementation services from Denovo without conferring any benefit on OTC.

56. In connection with its execution of the parties' agreements and the performance of

Denovo's services, OTC paid Denovo significant amounts of money and conferred significant benefits upon Denovo for services that provided no benefit to OTC.

57. Denovo has been unjustly enriched by the receipt of the monies paid by OTC. Denovo's retention of these monies, which it obtained on the basis of fraud and misrepresentations, would be unjust and inequitable, and OTC is entitled to disgorgement and restitution of all sums it has paid to Denovo.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE**

WHEREFORE, Plaintiff Oriental Trading Company, Inc. prays the Court to enter judgment in its favor and against Defendant Denovo Ventures, LLC, granting relief as follows:

a. Awarding damages, in an amount to be proven at trial, on the above causes of action against Defendant;

b. Awarding pre-judgment and post-judgment interest; and

c. Awarding such other and further relief as the Court deems appropriate.

Dated:  March 1, 2022

        *Filed by Plaintiff,*
        *Oriental Trading Company, Inc.,*

By:    */s/ John V. Matson*

    John V. Matson, #25278
    Gabreal M. Belcastro, #27019
    KOLEY JESSEN P.C., L.L.O.
    One Pacific Place, Suite 800
    1125 South 103rd Street
    Omaha, NE  68124-1079
    (402) 390-9500
    John.matson@koleyjessen.com
    Gabreal.belcastro@koleyjessen.com

*Attorneys for Plaintiff Oriental Trading Company, Inc.*

AND

Martin W. Jaszczuk,
*PHV App. to be submitted*
Daniel I. Schlessinger,
*PHV App. to be submitted*
Margaret Schuchardt,
*PHV App. to be submitted*
Seth Corthell,
*PHV App. to be submitted*
JASZCZUK P.C.
30 South Wacker Drive, Suite 2200
Chicago, Illinois  60606
Tel: (312) 442-0509
mjaszczuk@jaszczuk.com
dschlessinger@jaszczuk.com
mschuchardt@jaszczuk.com
scorthell@jaszczuk.com

*Attorneys for Plaintiff Oriental Trading Company, Inc.*